MARK D. ROSENBAUM (CA Bar No. 59940)
mrosenbaum@publiccounsel.org
KATHRYN EIDMANN (CA Bar No. 268053)
keidmann@publiccounsel.org
JESSELYN FRILEY (CA Bar No. 319198)
jfriley@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:   (213) 385-2977
Facsimile:    (213) 385-9089

JOHN LIBBY (CA BAR NO. 128207)
JLibby@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone:   310.312.4000
Facsimile:    310.312.4224

JON GREENBAUM (CA Bar No. 166733)
jgreenbaum@lawyerscommittee.org
EZRA ROSENBERG (D.C. Bar No. 360927)
*Pro Hac Vice* Application Pending
erosenberg@lawyerscommittee.org
POOJA CHAUDHURI (CA Bar No. 314847)
pchaudhuri@lawyerscommittee.org
BRADLEY S. PHILLIPS (CA Bar No. 85263)
bphillips@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
1500 K Street NW
Washington, DC 20005
Telephone:   (202) 662-8600
Facsimile:    (202) 783-0857

CHRISTOPHER L. WANGER (CA Bar No. 164751)
CWanger@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, California 94111
Telephone:   (415) 291-7400
Facsimile:    (415) 291-7474

Attorneys for Intervenor-Defendants,
CALIFORNIA COMMON CAUSE, LEAGUE
OF WOMEN VOTERS OF CALIFORNIA and
COMMUNITY COALITION

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL ISSA, JAMES B. OERDING, JERRY GRIFFIN, MICHELLE BOLOTIN and MICHAEL SIENKIEWICZ,<br><br>Plaintiffs,<br><br>vs.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; and ALEX PADILLA, in his official capacity as Secretary of State of California,<br><br>Defendants. | Case No. 2:20-cv-01044-MCE-CKD<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AS DEFENDANTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**FILED CONCURRENTLY WITH [PROPOSED] ANSWERS IN INTERVENTION**<br><br>**Date: July 9, 2020**<br>**Time: 2:00 pm**<br>**Courtroom: 7, 14th Floor**<br>**Judge: Hon. Morrison C. England, Jr.** |

# NOTICE OF MOTION AND MOTION TO INTERVENE

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 9, 2020, at 2:00 p.m. or as soon thereafter as they may be heard in Courtroom 7 of the above-entitled court, located at 501 I Street, Sacramento, California 95814, California Common Cause, League of Women Voters of California, and Community Coalition (collectively "Proposed Intervenors") will and hereby do move this Court for entry of an order permitting Proposed Intervenors to intervene permissively in the above-captioned matter for the purpose of defending the fundamental right to vote of their members and all other California citizens.

This motion is made pursuant to Federal Rules of Civil Procedure Rule 24(b)(1)(B) for permissive intervention on the grounds that 1) Proposed Intervenors have a claim or defense that shares with the main action a common question of law or fact, 2) there exist independent grounds for jurisdiction, and 3) this motion is timely.

This motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the supporting declarations of Jonathan Stein (Ex. A – hereinafter Stein Decl.), Stephanie Doute (Ex. B – hereinafter Doute Decl.), and Hector Sanchez (Ex. C – hereinafter Sanchez Decl.), the supporting expert declaration of Dr. Ranit Mishori (Ex. D – hereinafter Mishori Decl.); the concurrently-lodged Answers in Intervention setting out the claims and defenses for which intervention is sought, as required by Federal Rule of Civil Procedure 24(c); all documents and pleadings on file in this action; and such other oral and documentary evidence and argument as may be presented at the hearing on this motion.

Dated: June 10, 2020

PUBLIC COUNSEL

By: /s/ Mark D. Rosenbaum (as authorized on 6/10/20)
    Mark D. Rosenbaum
    Kathryn Eidmann
    Jesselyn Friley
    610 S. Ardmore Avenue
    Los Angeles, California 90005
    Telephone: (213) 385-2977
    Facsimile: (213) 385-9089
    Email: mrosenbaum@publiccounsel.org
           keidmann@publiccounsel.org
           jfriley@publiccounsel.org

LAWYERS' COMMITTEE FOR CIVIL RIGHTS

By: /s/ Jon Greenbaum (as authorized on 6/10/20)
    Jon Greenbaum
    Ezra Rosenberg
    Pooja Chaudhuri
    Bradley S. Phillips
    1500 K Street NW
    Washington, DC 20005
    Telephone: (202) 662-8600
    Facsimile: (202) 783-0857
    Email: jgreenbaum@lawyerscommittee.org
           erosenberg@lawyerscommittee.org
           pchaudhuri@lawyerscommittee.org
           bphillips@lawyerscommittee.org

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ John Libby
    John Libby
    2049 Century Park East
    Suite 1700
    Los Angeles, CA 90067
    Telephone: (310) 312-4000
    Facsimile: (310) 312-4224
    Email: JLibby@manatt.com

MANATT, PHELPS & PHILLIPS, LLP
    Christopher L. Wanger
    One Embarcadero Center, 30th Floor
    San Francisco, California 94111
    Telephone: (415) 291-7400
    Facsimile: (415) 291-7474
    Email: CWanger@manatt.com

Attorneys for Intervenor-Defendants, CALIFORNIA COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF CALIFORNIA and COMMUNITY COALITION

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Proposed Intervenors are nonpartisan organizations dedicated to promoting American democracy and the interests of California voters. They seek the Court's permission to intervene in this matter to defend the right of their members and all California citizens to vote safely in the general elections on November 3, 2020. Proposed Intervenors, relying on the consensus of public-health experts, anticipate that COVID-19 will pose a grave threat to public health in November. At the very least, no one can conceivably guarantee now that COVID-19 will *not* continue to pose a serious threat, meaning that the only safe course for state officials is to act *now* to take the necessary steps to simultaneously protect the public health and the right to vote in November.

Ensuring that all eligible voters in California have the ability to vote by mail is one crucial step. Voting in person poses significant health risks, exposing voters and poll-workers to infection while they stand in line, share confined spaces, touch common surfaces, and converse with other people. Poll-workers and voters are especially vulnerable because they tend to be older—indeed, the majority of poll workers in 2018 were over 60. And the risk is not limited to voters and poll-workers but extends to *everyone* in their communities, workplaces, and families with whom they will inevitably come into contact after Election Day. Because the pandemic has had devastating and disproportionate effects on African American and Latino individuals, voters who are members of these minority groups—and their neighbors, fellow workers, and families—face even greater risks. Voting in person will, moreover, be impossible for Californians who have underlying medical conditions or who, in the days leading up to the election, exhibit any of the ten symptoms of COVID-19 or come into contact with a person who has the virus. These categories of voters—racial minorities and medically vulnerable individuals—are among those represented by the Proposed Intervenor organizations, which are therefore particularly well-suited to advancing and protecting their interests.

Government officials can and must ensure that the unprecedented circumstances of the pandemic do not deny American citizens, particularly citizens who are African American and/or

Latino or who are medically vulnerable, the right to vote. Plaintiffs, who include the Republican National Committee and Congressman Darrell Issa, seek to enjoin California Governor Gavin Newsom's executive order requiring counties to provide a mail-in ballot to every active registered voter in advance of the November elections. By asking this Court to prohibit the distribution of mail-in ballots, Plaintiffs seek to place drastic restrictions on the time, place, and manner of elections. Due to COVID-19, such suppression would primarily affect people of color and medically vulnerable individuals, who experience disproportionately high rates of infection, illness, and death due to the pandemic and face grave risks to their health and the health of their communities if they must vote in person. Incredibly, Plaintiffs' core claim is that, by making it safer for *all* California citizens—Democrats and Republicans alike—to vote, the Governor's Order somehow violates the right to vote of the handful of individual Plaintiffs.

As organizations that serve, represent, and comprise individuals whose fundamental right to vote would most certainly be impaired and whose health would most certainly be endangered by a grant of the relief sought by Plaintiffs, Proposed Intervenors are critical participants in these actions and are well-situated to defend the right of all California voters to cast their ballots safely. They have timely moved to intervene, less than three weeks after the filing of Plaintiffs' actions. The Court should grant Proposed Intervenors' motion under the standard for permissive intervention.

II.   **FACTS**

   A.   **The COVID-19 Pandemic Will Remain a Threat to the Safety of California Voters in November 2020**

The COVID-19 pandemic is an ongoing public-health emergency that has hit California especially hard and has caused widespread disruptions in civic life. As of June 8, over 130,000 Californians had tested positive for COVID-19 and almost 4,500 have died of the disease.[1] The number of weekly cases in California continues to rise, reaching 17,000 in the last week of May.[2]

---

[1] *COVID-19 Updates*, CAL. DEP'T PUB. HEALTH (June 8, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

[2] *COVID-19 Statewide Update*, STATE OF CAL. (June 9, 2020), https://update.covid19.ca.gov/.

Elderly people and people of any age who have certain underlying conditions, including high blood pressure, diabetes, chronic lung disease, severe obesity, and others, are especially likely to have prolonged serious illness or to die from the disease. Mishori Decl. ¶¶ 10–12. People of color have faced especially high rates of infection, complications, and death resulting from this coronavirus.[3] *Id.* ¶¶ 15–22. Latinos are disproportionately likely to contract the virus—in California, Latinos are 39% of the population but make up 54% of the State's coronavirus cases. *Id.* ¶ 21. Black Americans are similarly affected disproportionately—they represent only 5% of California's population but 10% of the State's COVID-19 deaths. *Id.* Nationwide, black Americans are dying at a rate almost two and a half times higher than white Americans.[4] Low-income communities have been especially hard-hit.[5]

Doctors and public health experts have identified several reasons why this coronavirus has caused such devastation in communities of color and low-income communities. Mishori Decl. ¶ 15. The "social determinants of health" are conditions in a person's life that shape every aspect of their health, including their susceptibility to the severest effects of COVID-19 infection. *Id.* ¶¶ 16–17. In communities of color and low-income communities, the social determinants of health include reduced access to quality health care, higher prevalence of underlying chronic medical conditions, and housing challenges. *Id.* ¶¶ 15–19. Already predisposed to medical conditions and poor health, people of color and low-income people are also more likely to be employed in essential jobs that expose them to COVID-19, and are less likely to have access to testing for coronavirus infection. *Id.* These factors subject people of color and low-income people to greater

---

[3] *COVID-19 in Racial and Ethnic Minority Groups*, CTR. FOR DISEASE CONTROL AND PREVENTION (June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html ("[C]urrent data suggest a disproportionate burden of illness and death among racial and ethnic minority groups.").

[4] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RESEARCH LAB (May 27, 2020), https://www.apmresearchlab.org/covid/deaths-by-race.

[5] *See* Wyatt Koma et al., *Low-Income and Communities of Color at Higher Risk of Serious Illness if Infected with Coronavirus*, KAISER FAMILY FOUND. (May 7, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/low-income-and-communities-of-color-at-higher-risk-of-serious-illness-if-infected-with-coronavirus/.

exposure to the coronavirus, greater severity of disease, and substandard or inaccessible medical care. This confluence of longstanding disparities and injustice is killing people.

While the world waits for a vaccine that is certainly many months or years away, public-health experts and government officials have stressed that physical distancing is necessary to prevent the spread of the virus. Mishori Decl. ¶¶ 9, 14. After seven weeks of near-complete closure, the State of California has only recently allowed the reopening of establishments like shops and restaurants, only in some counties and only if they can maintain six feet of distance between individuals.[6] The effects of reopening are not yet known, but cases in California are beginning to spike. *Id.* ¶ 31. To keep voters safe, states run by both Republican and Democratic elections officials have expanded vote-by-mail options or have conducted elections entirely by mail.[7] Experts agree that this advanced planning is necessary because "we can expect that coronavirus will continue to affect, sicken and kill large numbers of Americans moving forward and into the fall." *Id.* ¶ 32.

The 2020 primary elections have proven that in-person voting causes transmission of COVID-19. Multiple Florida poll workers tested positive for COVID-19 in the aftermath of the state's in-person primary election.[8] Chicago officials reported that a poll worker for the city's March 17 election died of COVID-19 and may have exposed voters, poll workers, field investigators, and cartage companies who were present at the same polling site.[9] Following the

---

[6] *Order of the State Public Health Officer: May 7, 2020*, CAL. DEP'T PUB. HEALTH at 2, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20 Library/COVID-19/SHO%20Order%205-7-2020.pdf.

[7] Legislation in Alaska, Missouri, Ohio, South Carolina, and Utah has expanded vote-by-mail options, and bills are pending in a number of other states. Governors and Secretaries of State in even more state have announced plans to expand vote by mail through other mechanisms. *See COVID-19 and Elections*, NAT'L CONF. ST. LEGISLATURES (June 1, 2020), https://www.ncsl.org/research/elections-and-campaigns/state-action-on-covid-19-and-elections.aspx.

[8] Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, NEWS 4 JAX (Mar. 30, 2020), https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-coronavirus/; David Smiley & Bianca Padró Ocasio, *Florida Held Its Primary Despite Coronavirus. Two Broward Poll Workers Tested Positive*, MIAMI HERALD (Mar. 26, 2020), https://www.miamiherald.com/news/politics-government/article241539451.html.

[9] Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, 5 CHI. (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

Wisconsin primary, the state's Department of Health conducted a contact-tracing analysis that found that 52 persons who voted in-person tested positive for COVID-19.[10] Mishori Decl. ¶ 49. Economists found a "statistically and economically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election."[11]

The risks of in-person voting are clear to doctors and public health experts. Hundreds of voters can cycle through a polling place on Election Day, exposing poll workers and one another to their respiratory droplets in confined, poorly ventilated spaces that facilitate transmission. *Id.* ¶¶ 34–39. Poll-workers themselves are likely to be older—studies have reported that most are over 60—and therefore more likely to have high-risk conditions. *Id.* ¶ 38. Voting machines and materials exchanged among voters and poll-workers are potential sites of surface transmission. *Id.* ¶¶ 40–41. Any precautionary measures, such as disinfection of machines and surfaces between each voter, are likely to slow down the voting process, which will subject voters to exposure in long lines. *Id.* ¶¶ 41–44. Even if all voters and poll-workers followed best practices, they would still face a risk of exposure. *Id.* ¶ 45. Asymptomatic individuals could spread the disease and those with mild symptoms could decide to vote despite the risk of transmission. *Id.*

Recognizing that the pandemic threatens the safety of California voters during the upcoming November 2020 elections,[12] Governor Newsom took steps to protect the health of Californians while preserving their opportunity to vote. On May 8, 2020, the Governor issued Executive Order N-64-20, which provides for mail-in ballots to be distributed to all active

---

[10] Chad D. Cotti et al., The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary 1–2 (Nat'l Bureau of Econ. Research, Working Paper No. 27187, 2020), https://www.nber.org/papers/w27187.pdf.

[11] *Id.*

[12] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA TODAY (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/; Kristine A. Moore et al., *COVID-19: The CIDRAP Viewpoint: The Future of the COVID-19 Pandemic*, CTR. FOR INFECTION DISEASE RESEARCH AND POLICY 1, 5–6 (2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf ("[T]he length of the pandemic will likely be 18 to 24 months . . . .").

registered voters in advance of the November elections.[13] The Governor issued a subsequent order on June 3, 2020, Executive Order N-67-20, which requires that counties maintain physical distancing at in-person polling locations, clarifies that voters with inactive registrations will not receive vote-by-mail ballots, and requires county elections officials to use ballot tracking and barcode systems for all vote-by-mail ballot envelopes.[14]

Doctors, public health experts, and voting rights organizations have all advocated for the distribution of mail-in ballots to all voters.[15] Stein Decl. ¶¶ 9–13; Doute Decl. ¶ 13; Sanchez Decl. ¶¶ 10–12; Mishori Decl. ¶¶ 50–52. According to these experts and advocates, merely providing an option for voters to request a mail-in ballot in advance is not enough to eliminate the risk of spreading the coronavirus. *Id*. Requesting a mail-in ballot is an insurmountable burden for voters with low literacy, limited language skills, and those with significant work and care responsibilities. Mishori Decl. ¶ 51; Stein Decl. ¶¶ 11–13; Sanchez Decl. ¶¶ 10–12. Organizations like Proposed Intervenors work hard to educate the public and help voters overcome administrative burdens to voting, but they cannot reach everyone. Stein Decl. ¶¶ 15–16; Sanchez Decl. ¶¶ 5–8; Doute Decl. ¶¶ 11–14. Those who plan to vote in-person may develop symptoms after the deadline to request a mail-in ballot, or even the day of the election, or may learn that they have been exposed to the virus and could be contagious. Mishori Decl. ¶ 51. If they do not receive a mail-in ballot in advance, these voters will have to choose between not voting and endangering their communities. States need not put voters in this position.

### B. Plaintiffs Seek to Undo California's Efforts to Protect Voters

On May 21 and May 24, 2020, Plaintiffs filed two lawsuits challenging the first of Governor Newsom's executive orders about the November election. The first action was brought by former United States Representative and current congressional candidate Darrell Issa and four

---

[13] State of Cal., Exec. Order No. N-64-20 (2020).

[14] *Id*.

[15] Letter to Members of the United States Senate and House of Representatives, Public Health Experts (May 5, 2020), https://cdn.americanprogress.org/content/uploads/2020/05/05061221/21DemocracyTeam_finalmailvotingandcovid19.pdf (signed by over 800 public health experts).

California voters ("Issa Plaintiffs") against Governor Newsom and Secretary Padilla. The Issa Plaintiffs allege claims under the Elections and Electors Clauses of the United States Constitution, the Fourteenth Amendment Due Process Clause, and the *ultra vires* doctrine. Doc. 1, No. 2:20-cv-01044 ("Issa Compl.") at 11–13. The second action was brought by the Republican National Committee, the National Republican Congressional Committee, and the California Republican Party ("RNC Plaintiffs") against Governor Newsom and Secretary Padilla. The RNC Plaintiffs allege claims under the Elections and Electors Clauses, the Fourteenth Amendment, and the Equal Protection Clause. Doc. 1, No. 2:20-at-00509 ("RNC Compl.") at 24–26. Both complaints seek injunctive and declaratory relief that would prohibit the State from implementing and enforcing Executive Order N-64-20.

Plaintiffs' allegations echo long-debunked claims that associate mail-in ballots with voter fraud.[16] In reality, mail vote fraud is virtually nonexistent.[17] Millions of Americans vote by mail—one in four voters did so in the last two federal elections.[18] Yet an exhaustive investigation found only 491 instances of mail vote fraud committed between 2000 and 2012, a period in which billions of votes were cast.[19] Polls have found that most Americans want mail-in ballots to be sent to all active registered voters, rather than being available only upon request, in November.[20]

---

[16] *See, e.g.*, Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud; Matt Barretto et al., *Debunking the myth of voter fraud in mail ballots*, UCLA LPPI VOTING RIGHTS PROJECT, UNIV. N. M. CTR. FOR SOC. POLICY, UNION OF CONCERNED SCIENTISTS (Apr. 14, 2020), https://latino.ucla.edu/wp-content/uploads/2020/04/LPPI-VRP-Voter-Fraud-res.pdf.

[17] Weiser & Ekeh, *supra* note 16; Barretto, *supra* note 16.

[18] Weiser & Ekeh, *supra* note 16; *see also EAVS Deep Dive: Early, Absentee and Mail Voting*, U.S. ELECTION ASSISTANCE COMM'N (Oct. 17, 2017), https://www.eac.gov/documents/2017/10/17/eavs-deep-dive-early-absentee-and-mail-voting-data-statutory-overview.

[19] Corbin Carson, *Election Fraud in America*, NEWS21 (Aug 12. 2020), https://votingrights.news21.com/interactive/election-fraud-database/.

[20] Chris Kahn, *Most Americans, unlike Trump, want mail-in ballots for November if coronavirus threatens: Reuters/Ipsos poll*, REUTERS (Apr. 7, 2020), https://www.reuters.com/article/us-usa-election-poll/most-americans-unlike-trump-want-mail-in-ballots-for-november-if-coronavirus-threatens-reuters-ipsos-poll-idUSKBN21P3G0.

Plaintiffs' arguments are especially misguided and dangerous because they lead to the unavoidable implication that voting by mail is per se unconstitutional. Their theories for these claims rely on the assertion that making vote-by-mail available causes unconstitutional and unlawful vote dilution. Issa Compl. ¶ 49; RNC Compl. ¶¶ 159–64. But if this is true—and Proposed Intervenors adamantly assert that is it not—then California's existing vote-by-mail systems are unconstitutional.

Plaintiffs' lawsuits, if successful, would have the effect of endangering poll-workers and voters and disenfranchising California's most vulnerable voters, including African Americans, Latinos, and medically vulnerable individuals. The implications could resonate long after this election, if Plaintiffs prevail on their theory that voting by mail is per se unconstitutional. For some of the Plaintiffs, this disenfranchisement may be precisely the point.[21]

### C. Proposed Intervenors Are Organizations That Promote the Interests of Voters

Proposed Intervenors are organizations that serve, represent, and have members who are California voters. All of them have worked to engage voters leading up to the November 2020 elections and advocate in favor of sending mail-in ballots to all voters. *See* Part II.A, *supra*.

California Common Cause is a non-profit political advocacy organization and a chapter of the national Common Cause organization. Stein Decl. ¶ 2. With over 100,000 members, California Common Cause works to encourage civic engagement and public participation in democracy, to ensure that public officials and public institutions are accountable to and reflective of all people, and to implement structural changes through the American democratic process. *Id*. ¶¶ 2, 5. California Common Cause is nonpartisan and uses grassroots mobilization, community education, coalition building, legislative advocacy, and litigation to build a democracy that includes everyone. *Id*. ¶ 2 California Common Cause is working to make sure that voters in communities that vote at the lowest rates and use vote-by-mail at the lowest rates—which are also

---

[21] Plaintiff Darrell Issa alleges that he "has already had to reevaluate his electoral strategy in order to campaign in the 50th Congressional District as a result of EO N-64-20." Issa Compl. ¶ 53.

the communities that have been hit hardest by COVID-19—can exercise their right to vote without putting their health at risk. *Id.* ¶ 9.

The League of Women Voters of California is a Sacramento-based non-profit, nonpartisan political organization that encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. Doute Decl. ¶ 2. The League runs candidate forums, provides voter education, and registers voters. *Id.* ¶ 4. The League's 7,500 members and volunteers do community outreach work and meet prospective voters at town halls and other community organization meetings. *Id.* ¶¶ 4–5. The League also advocates for voter empowerment through legislation and other policy work, including implementation of policies that empower voters. *Id.* ¶ 4.

Community Coalition ("CoCo") is a community-based organization that serves African American and Latino communities and people living below the poverty line in South Los Angeles. Sanchez Decl. ¶ 1. The group has over 3,500 dues-paying members and more than 1,000 volunteers. *Id.* ¶ 4. CoCo's major platforms include voter engagement, education, and turnout because the organization believes that community that votes is a community that will be heard. *Id.* ¶ 5. CoCo has mobilized voters in the historically disenfranchised South LA area to exercise their right to vote. *Id.* ¶¶ 6–7.

Proposed Intervenors seek permissive intervention to advocate for the interests of their members and of all California voters, including their safety from COVID-19 and their ability to exercise their right to vote.

### III. <u>ARGUMENT</u>

The Court should grant Proposed Intervenors permission to intervene in this action for the purpose of defending Californians' right to vote and securing their safety from COVID-19.

####   A. <u>Proposed Intervenors Meet the Standards for Permissive Intervention</u>

Proposed Intervenors move for permissive intervention under Federal Rule of Civil Procedure Rule 24(b)(1)(B). The Ninth Circuit applies three threshold requirements to a motion for permissive intervention: (1) the intervenor's claim must share a common question of law or

1  fact with the main action; (2) the motion must be timely; and (3) the court must have an
2  independent basis for jurisdiction over the applicant's claims. *Donnelly v. Glickman*, 159 F.3d
3  405, 412 (9th Cir. 1998).

4        All of these requirements are satisfied here. The motion is timely, and permitting
5  intervention at this early stage of the lawsuit, less than three weeks after the filing of the
6  complaints and before any briefing on a preliminary injunction, would not prejudice the parties.
7  Proposed Intervenors intend to raise questions of law with respect to the fundamental right to
8  vote, the Equal Protection Clause, and the Due Process Clause, and questions of fact related to the
9  pandemic, in-person voting, mail-in ballots, and the voters and poll-workers who are most
10 affected by the interaction among these issues. Finally, the test for whether there is an
11 independent basis for jurisdiction is satisfied with respect to the constitutional claims that
12 Proposed Intervenors will address.

13       Rule 24 is construed liberally in favor of intervenors, and a court's decision on a motion to
14 intervene is guided primarily by practical considerations rather than technical distinctions. *Sw.*
15 *Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001). "A liberal policy in
16 favor of intervention serves both efficient resolution of issues and broadened access to the courts.
17 By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we
18 often prevent or simplify future litigation involving related issues; at the same time, we allow an
19 additional interested party to express its views before the court." *United States v. City of Los*
20 *Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (citation omitted). A court is required to accept as
21 true the non-conclusory allegations made in support of an intervention motion, particularly where
22 the propriety of intervention is being determined before discovery. *Berg*, 268 F.3d at 819-20.

23       **1.**    **The Motion Is Timely**

24 Courts consider three factors in determining whether a motion to intervene is timely: (1)
25 the stage of the proceeding, (2) the prejudice to other parties, and (3) the reason for and length of
26 the delay. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).
27 All three factors here weigh heavily in favor of the timeliness of this motion. Proposed
28 Intervenors are moving to intervene *less than three weeks* after the actions were filed, before the

10
NOTICE OF MOTION AND MOTION TO INTERVENE
CASE NO. 2:20-CV-01044-MCE-CKD

defendants have answered. Motions to intervene filed at significantly later stages of a suit have been deemed timely. *See, e.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (motion to intervene filed "less than three months" after suit filed and "less than two weeks" after answer); *United States v. State of Oregon*, 745 F.2d 550, 552 (9th Cir. 1984) (granting intervention in a year-old case when the litigation was "entering a new stage").

There can be no prejudice to the parties, and there is no reason why permissive intervention would cause any delay in resolution of the cases. *See W. States Trucking Ass'n v Schoorl*, No. 2:18-cv-1989-MCE-KJN, 2018 U.S. Dist. LEXIS 193481, at *3–4 (E.D. Cal. Nov. 13, 2018) (finding intervention timely at "the very outset of litigation"). Proposed Intervenors agree to abide by the Court's scheduling order, and the Court has made no substantive rulings. *See N.W. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996); *Hazel Green Ranch, Ltd. Liab. Co. v. United States Dept. of Int.*, No. 1:07-CV-00414-OWW-SMS, 2007 U.S. Dist. LEXIS 68728, at *9 (E.D. Cal. Sep. 4, 2007). In fact, by submitting their proposed Answer in Intervention with this Motion, Proposed Intervenors will be responding ahead of the State defendants.

### 2. Proposed Intervenors' Claims or Defenses Share Questions of Law and Fact with the Main Actions

A prospective intervenor's claim or defense must raise a question of law or fact in common with the main action. *See Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009). As this Court has held, "common questions of both law and fact are present" when intervenors "seek to assert defenses against the Plaintiff's requested injunction, which lies at the heart of th[e] matter." *See Conservation Cong. v. United States Forest Serv.*, No. 2:16-cv-00864-MCE-AC, 2018 U.S. Dist. LEXIS 10830 at *9 (E.D. Cal. Jan. 22, 2018). Here, Proposed Intervenors seek to assert defenses against Plaintiffs' claims that the State's voting system is unconstitutional and the accompanying request for an injunction on the same grounds. These issues are at the heart of both matters.

More specifically, Proposed Intervenors intend to contribute to the Court's resolution of the following questions of law and fact, all of which are common to the main actions:

- Whether Executive Order N-64-20, by requiring that all active registered voters in California receive a mail-in ballot, denies or dilutes Plaintiffs' or Plaintiffs' members' right to vote;

- Whether the burden that Executive Order N-64-20 places on Plaintiffs' or Plaintiffs' members' right to vote, if any, is outweighed by the State's justifications, including protection of the public health and all Californians' right to vote safely;

- Whether Executive Order N-64-20, by authorizing the Governor to work with the Legislature and the Secretary of State to ensure the safety of in-person voting, violates the Equal Protection Clause;

- Whether the public interest would be served or disserved by a court order enjoining Executive Order N-64-20;

Whether a voting system that allows for voting by mail is per se unconstitutional.

Proposed Intervenors satisfy the common-questions element because "the central issues [raised by their Answer] are the same [as those raised by the Complaint]." *See In re Grupo Unidos Por El Canal S.A.*, No. 14-mc-80277-JST (DMR), 2015 U.S. Dist. LEXIS 52358, at *15–16 (N.D. Cal. Apr. 21, 2015).

### 3.   There is an independent basis for jurisdiction

The independent jurisdictional requirement for permissive intervention serves to "prevent[] the enlargement of federal jurisdiction in such cases only where a proposed intervenor seeks to bring new state-law claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). In cases where jurisdiction is based on federal questions and where the proposed intervenor is not bringing new state-law claims, "the independent jurisdictional grounds requirement does not apply to proposed intervenors." *Id*. Proposed Intervenors do not intend to bring new state law counterclaims or cross-claims. The independent-jurisdiction element is satisfied. *Id*.

**B.     The Court Should Exercise Its Discretion to Grant Permissive Intervention**

Where a putative intervenor has met the threshold requirements for permissive intervention, the court may consider other factors in the exercise of its discretion, including "the nature and extent of the intervenors' interest" and "whether the intervenors' interests are adequately represented by other parties." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977). An intervenor's "greater first-hand knowledge" of a law's impact on private individuals "may support a trial judge's discretionary grant of permissive intervention." *Prete v. Bradbury*, 438 F.3d 949, 958 n.13 (9th Cir. 2006) (emphasis omitted). Here, the equities support permissive intervention.

**1.     Proposed Intervenors Are Uniquely Positioned to Represent Voters**

Proposed Intervenors represent a broad constituency of Californian voters, including members of racial minorities, low-income voters, and others who are particularly likely to be harmed by a requirement that they vote in person in the face of the COVID-19 pandemic. The views and circumstances of these voters cannot be represented or expressed by the four individual "voter" plaintiffs in the Issa Complaint, none of whom contributes facts other than their county of residence and intention to vote in the November elections. *See* Issa Compl. ¶¶ 7-10. By representing a broad swath of voters, including those at greatest risk of infection, complications, and death from COVID-19, Proposed Intervenors are well positioned "to assist this court's comprehension of the facts and applicable law." *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-cv-01282-KJM-KJN, 2016 U.S. Dist. LEXIS 139383, at *15-17 (E.D. Cal. Oct. 5, 2016).

The interests of Proposed Intervenors and their members cannot be fully represented by the other parties in this case. While the State and Proposed Intervenors "may share the same 'ultimate objective'" of defending the mailing of ballots to all registered voters, their interests "are neither 'identical' nor 'the same'"—in fact, they may be "in some respects adverse." *Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. 303, 308 (E.D. Cal. 2011) (quoting *Berg*, 268 F.3d 810, 823 (9th Cir. 2001)). The Executive Order at issue states that it was enacted to further the rights of all voters and to keep them safe; but, as defendants in these actions, the State

Defendants are differently situated than the Proposed Intervenors. In designing and implementing rules about the time, place, and manner of elections, the State must take into account factors in addition to public health and Californians right to vote, including the State's economy, administrative concerns, and the State's relationships with counties. Proposed Intervenors do not share these additional constraints: their sole objective here is to protect the rights of their members and all California voters to cast their ballots and to do so safely. *See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (affirming grant of motion to intervene because proposed intervenors' interests were "potentially more narrow" than the "interests of the public at large").

### 2. Courts Routinely Grant Intervention to Voters and Voter Organizations in Analogous Cases

The Eleventh Circuit has granted intervention as of right (not merely permissive, as is sought here) to voters and voter organizations in closely analogous circumstances. In *Meek v. Metro. Dade Cty.*, 985 F.2d 1471 (11th Cir. 1993), voters and voter organizations sought to intervene as of right as defendants alongside the County defendants in a Voting Rights Act case. *Id.* (abrogated on other grounds by *Dillard v. Chilton County Comm'n*, 495 F.3d 1324 (2007). The district court denied intervention, but the Eleventh Circuit reversed, writing:

> We disagree with the district court's conclusion THAT the county defendants were adequate representatives of the intervenors because they had identical interests. The intervenors sought to advance their own interests in achieving the greatest possible participation in the political process. Dade County, on the other hand, was required to balance a range of interests likely to diverge from those of the intervenors. For example, the County Commissioners had to consider the overall fairness of the election system to be employed in the future, the expense of litigation to defend the existing system, and the social and political divisiveness of the election issue. In addition, the County Commissioners were likely to be influenced by their own desires to remain politically popular and effective leaders. These divergent interests created a risk that Dade County might not adequately represent the applicants.

*Id.*, at 1478.

Similarly, in *Miller v. Blackwell*, 348 F.Supp.2d 916 (S.D. Ohio 2004), the court granted intervention as of right, as defendants, to individuals seeking to defend state and county procedures governing pre-election challenges to voters' registrations. In granting intervention, the court found that the intervenors had "interests divergent from those of the County Boards of

Elections and Secretary of State Blackwell," in that "[t]he latter seek an efficient and accurate electoral process revolving around Ohio election laws," while "[the intervenors] are concerned primarily with maintaining a process by which to challenge the eligibility of registered voters prior to the election in order to prevent possible dilution of their own votes." *Id.*, at 918 n.3; *see also Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. at 308 (finding that non-profit organization's interests were not identical to public agency because although both aimed to promote health and protect the environment, the non-profit was "not required to balance any economic impact" against its objectives).

Here, Proposed Intervenors do not seek intervention as of right, but only permissive intervention, making the holdings of these courts even more powerful precedent for the granting of this motion. As this Court has held, "ensuring that all competing interests implicated" by a lawsuit are heard "will contribute to the just and equitable resolution of this case." *Pac. Rivers Council v. United States Forest Serv.*, No. CIV. S. 05-0953 MCE GGH, 2005 U.S. Dist. LEXIS 25136, at *5-6 (E.D. Cal. Oct. 19, 2005).

### 3. Proposed Interveners Will Assist the Court by Asserting Constitutional Rights on Behalf of Those Who Hold Those Rights

Finally, Proposed Intervenors' participation can aid the Court to resolve this matter expeditiously by clearly articulating the constitutional issues on behalf of voters. *See Earth Island Inst. v. United States Forest Serv.*, No. 2:05-cv-1608-MCE-GGH, 2006 U.S. Dist. LEXIS 66758, at *6 (E.D. Cal. Sep. 8, 2006). Though the State can identify constitutional arguments involving the right to vote, the State does not hold that right. The federal courts, through standing doctrine and other bedrock legal principles, have long stood for the proposition that the people who are most impacted by the central issues of a case should be the ones to litigate it. Proposed Intervenors represent precisely those people who, absent the opportunity to vote by mail, will be confronted with the most perilous choice between exercising their right to vote and risking their health and that of their families, neighbors, and fellow workers. Proposed Intervenors will depart from the State's defense by advocating for voters' constitutional rights on behalf of the very people who hold those rights.

## IV. CONCLUSION

Proposed Intervenors respectfully request that this Court grant them permission to intervene.

Dated: June 10, 2020

PUBLIC COUNSEL

By: /s/ Mark D. Rosenbaum (as authorized on 6/10/20)
    Mark D. Rosenbaum
    Kathryn Eidmann
    Jesselyn Friley
    610 S. Ardmore Avenue
    Los Angeles, California 90005
    Telephone:  (213) 385-2977
    Facsimile:  (213) 385-9089
    Email:  mrosenbaum@publiccounsel.org
             keidmann@publiccounsel.org
             jfriley@publiccounsel.org

LAWYERS' COMMITTEE FOR CIVIL RIGHTS

By:/s/ Jon Greenbaum (as authorized on 6/10/20)

    Jon Greenbaum
    Ezra Rosenberg
    Pooja Chaudhuri
    Bradley S. Phillips
    1500 K Street NW
    Washington, DC 20005
    Telephone:  (202) 662-8600
    Facsimile:  (202) 783-0857
    Email:  jgreenbaum@lawyerscommittee.org
             erosenberg@lawyerscommittee.org
             pchaudhuri@lawyerscommittee.org
             bphillips@lawyerscommittee.org

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ John Libby
    John Libby
    2049 Century Park East
    Suite 1700
    Los Angeles, CA 90067
    Telephone:  (310) 312-4000
    Facsimile:  (310) 312-4224
    Email:  JLibby@manatt.com

MANATT, PHELPS & PHILLIPS, LLP
    Christopher L. Wanger
    One Embarcadero Center, 30th Floor
    San Francisco, California 94111
    Telephone:  (415) 291-7400
    Facsimile:  (415) 291-7474
    Email:  CWanger@manatt.com

Attorneys for Intervenor-Defendants, CALIFORNIA COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF CALIFORNIA and COMMUNITY COALITION