Robert Patrick Sticht (SBN 138586)
T. Russell Nobile*
Robert Popper*
Eric Lee (SBN 327002)
Judicial Watch, Inc.
425 Third Street SW, Suite 800
Washington, D.C. 20024
(202) 646-5172
(202) 646-5199 (fax)
Rsticht@judicialwatch.org
Rnobile@judicialwatch.org
Rpopper@judicialwatch.org
Elee@judicialwatch.org

*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Darrell Issa, et al, <br><br> Plaintiffs, <br><br> v. <br><br> Gavin Newsom, et al., <br><br> Defendants. | Case No. 2:20-cv-01044-MCE-CKD <br><br> **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing on July 16, 2020, at 10:00 a.m. |

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

I.    FACTUAL BACKGROUND .................................................................................... 2

      A.   California's Two Procedures for Mail-Based Voting:
          Vote-by-Mail Absentee Ballot and All-Mailed Elections
          Under the Voter's Choice Act ........................................................................ 2

      B.   Executive Order N-64-20 and Governor Newsom's Unilateral
          Decision to Impose a New All-Mailed Ballot Procedure. ................................. 4

      C.   California's Voter Registration Lists Are Not Ready for All-Mailed Voting ....... 5

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ................................................................................................................... 10

II.   Plaintiffs Are Likely to Succeed on the Merits Because EO N-64-20
     Violates the Elections Clause and the Electors Clause. ........................................ 10

      A.   Governor Newsom Has No Power to Regulate Federal
          Elections Under the Elections and the Electors Clause. ................................ 10

      B.   The Governor Lacks the Authority He Assumes Under
          State Law ...................................................................................................... 12

          1.   CAL. GOV'T CODE §§ 8567 and 8627 ................................................. 12

          2.   CAL. GOV'T CODE § 8571. .................................................................. 13

III.  The Remaining *Winter* Factors Weigh Heavily in Favor of Preliminary
     Relief. .................................................................................................................. 14

CONCLUSION ............................................................................................................... 16

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    Page No(s).

*Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)............................9

*Alvarado v. Selma Convalescent Hosp.*, 153 Cal. App. 4th 1292 (2007) ..........................14

*Am. Bev. Ass'n v. City & Cty. of S.F.*, 916 F.3d 749 (9th Cir. 2019) ...................................15

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ...............................................................................10, 11, 12

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..........................................10

*Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932)....................................11

*Bronco Wine Co. v. Jolly*, 129 Cal. App. 4th 988 (2005) ....................................................14

*Bush v. Gore*, 531 U.S. 98 (2000) .......................................................................................16

*Carleton v. Tortosa* 14 Cal. App. 4th 745 (1993)...............................................................14

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ............................................15

*Elrod v. Burns*, 427 U.S. 347 (1976)...................................................................................14

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)...................................................................13

*Griffin v. Padilla*, 417 F. Supp. 3d 1291 (E.D. Cal. 2019) .............................................14, 16

*Hawke v. Smith*, 253 U.S. 221 (1920) .................................................................................11

*Hobart v. Supervisors of Butte Cty.*, 17 Cal. 23 (1860).....................................................12

*Horeczko v. State Bd. of Registration*, 232 Cal. App. 3d 1352 (1991)...............................14

*Howard Jarvis Taxpayers Ass'n v. Padilla*, 62 Cal. 4th 486 (2016) ...................................11

*Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018)............................................6, 7

*In re Jennings*, 106 Cal. App. 4th 869 (2003)....................................................................14

*Judicial Watch, Inc., et al., v. Logan, et al.*, Civil No. 17-8948
    (C.D. Cal. Dec. 13, 2017) ...........................................................................1, 6, 7

*Lukens v. Nye*, 156 Cal. 498 (1909)...............................................................................11

ii

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) ...................................................................14

*Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916) ..........................................................12

*Rep. Nat. Comm. et al., v. Newsom*, et al., 2:20-cv-01055 (E.D. Cal. June 6, 2020) .........14

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...........................................................14

*Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012) ...........15

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ...................................................................3, 14

*Smiley v. Holm*, 285 U.S. 355 (1932) ...........................................................10, 12, 13, 14

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ....................................................14

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) .....................................................11

*Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ...............................................16

*Wilson v. United States*, Civ. No. C-95-20042-JW and C-94-20860-JW
    (February 2, 1998) .........................................................................................................7

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ..............................................................................9

**Constitutional Provisions**

U.S. CONST., art. I, § 4, cl. 1 .............................................................. *passim*

U.S. CONST., art. II, § 1, cl. 2 ............................................................. *passim*

U.S. CONST. AMEND. XII ..........................................................................................................16

CAL CONST., art. III, § 3 ...........................................................................................................11

CAL CONST., art. III, § 10 .........................................................................................................11

CAL CONST., art. IV, § 1 ...........................................................................................................10

**Statutes**

3 U.S.C. § 5 .............................................................................................................................16

3 U.S.C. § 15 ...........................................................................................................................16

52 U.S.C. § 20501 ...................................................................................1, 5

52 U.S.C. § 20507(a) ...............................................................................5, 15

52 U.S.C. § 20507(d) ................................................................................6, 7

52 U.S.C. § 20507(e) ...................................................................................6

52 U.S.C. § 20508(a) ...................................................................................6

CAL. ELEC CODE § 3001 ................................................................................2

CAL. ELEC CODE § 3003 ................................................................................2

CAL. ELEC CODE § 4005 ..............................................................................3, 4

CAL. ELEC. CODE § 6902 ...............................................................................4

CAL. ELEC. CODE § 8304 ...............................................................................4

CAL. GOV'T CODE § 8550 .............................................................................12

CAL. GOV'T CODE § 8567 ....................................................................4, 12, 13

CAL. GOV'T CODE § 8571 ...............................................................4, 12, 13, 14

CAL. GOV'T CODE § 8627 ....................................................................4, 12, 13

**Regulations and Orders**

11 C.F.R. § 9428.7 .......................................................................................6

Executive Order N-64-20 ....................................................................... *passim*

Executive Order N-67-20 ...............................................................................5

Cal. Code Regs. tit. 2, § 20108.1 .................................................................. 6

**Other Authorities**

John Myers, et al., *California Officials Demand Changes to L.A. Voting After Election Day Chaos*, L.A. TIMES, Mar. 4, 2020, available at  https://rb.gy/5hpx42 .....................................4

John Wildermuth, "*California Lawmaker Scrambles to Fix Bill to Make it Clear Ballots Won't Go to Phantom Voters,*" S.F. CHRONICLE, June 4, 2020 available at https://www.sfchronicle.com/politics/article/California-lawmaker-scrambles-to-fix-bill-to-

15317858.php ...................................................................................5

REPT. OF COMM'N ON FED. ELECTION REFORM, BUILDING CONFIDENCE IN U.S. ELECTIONS (2005) available at https://rb.gy/y6dtx8..............................................................8

*Signature Verification and Mail Ballots: Guaranteeing Access While Preserving Integrity*, STANFORD LAW SCHOOL, Law and Policy Lab, May 15, 2020 ................................................9

*States With No-Excuse Absentee Voting*, NATIONAL CONF. OF STATE LEGIS., May 1, 2020, available at https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx ...................................................2

Wall. St. J. Editorial, "*California Steals Its Own Election,*" WALL ST. J., Mar. 6, 2020 https://rb.gy/dimkie (last visited June 11, 2020) ...................................................4

**INTRODUCTION**

In 2017, Judicial Watch sued Los Angeles County and Secretary Padilla after it dis-covered anomalies in the County's voter registration data.[1]  The suit exposed that for the last *twenty years* there was no meaningful effort by California to implement the federally-mandated list maintenance program designed to cancel registrations based on the death of a voter or a change of residence.  The suit revealed that a staggering 1.6 million registrants in L.A. County—almost a quarter of the County's total registrants—may have died or changed address.  Subsequently, Judicial Watch and California entered into a settlement agreement resolving the largest violation of the list maintenance provisions in the history of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501, *et seq*.  Los An-geles County is still in the initial stages of improving the accuracy of its voter registration list.  Extrapolated statewide, the problem is likely much worse.  There is every reason to believe that problems revealed in that suit are propagated throughout the voter registration lists in California's 57 other counties.  No evidence or argument has ever materialized that would show that California's other counties were somehow immune from this systemic failure.[2]  Relevant here, this settlement raises serious questions about whether California's 58 coun-ties are ready for statewide all-mailed ballot elections.

With this violation as a backdrop, Governor Newsom issued Executive Order N-64-20 ("EO N-64-20" or "Executive Order"), ordering that "all voters who are […] registered to vote in [the November 3, 2020] election" be sent a ballot to vote by mail.  (*Exhibit 2*, Executive Order N-64-20, May 8, 2020.)  The Governor made this unilateral decision notwithstanding that the Elections Clause and the Electors Clause reserve for the California Legislature the power to regulate federal elections and the fact that the Legislature had already enacted laws establishing voting procedures that are at odds with his Order.  *See* U.S. CONST., art.

---

[1]      *Judicial Watch, Inc., et al., v. Logan, et al.*, Civil No. 17-8948, Doc. 1 (C.D. Cal. Dec. 13, 2017)

[2]      *See* discussion, *infra*, Part I.C.

1

I, § 4, cl. 1 and art. II, § 1, cl. 2.

Plaintiffs are a candidate for federal office and four registered California voters, in-cluding Republicans, a Democrat, and an independent. They have sued to enjoin EO N-64-20 and prevent Defendants from mandating voting changes that violate the U.S. Constitution, are *ultra vires*, and impermissibly violate Plaintiffs' constitutional and statutory rights. For the reasons set forth below, Plaintiffs respectfully request the Court issue an order enjoining EO N-64-20 and any other extraconstitutional and *ultra vires* changes by Defendants to the time, place, or manner in which California will conduct the November 2020 election.

## I.   FACTUAL BACKGROUND

### A. California's Two Procedures for Mail-Based Voting: Vote-by-Mail Absentee Ballot and All-Mailed Elections Under the Voter's Choice Act.

There are two procedures in California for mail-based voting with some voters being able to use one or both depending on whether their respective county has opted for all-mailed ballot elections under California's Voter's Choice Act ("VCA"). *See* S.B. 450, 2015-2016 Reg. Sess. (Cal. 2016) (enacting the VCA).

Non-VCA counties operate under California's "vote-by-mail" procedures, which are the State's procedure for traditional absentee voting. *See* CAL. ELEC. CODE §§ 3000-3026. California is a "no-excuse absentee ballot" state.[3]  CAL. ELEC CODE § 3003. Registered voters simply need to request an absentee ballot using the many options for making such request and one will be sent to the voter subject to various election integrity measures the Legislature incorporated in the state's vote-by-mail procedures. Ballots must be mailed within five days following such requests. CAL. ELEC. CODE § 3001. Thus, even before EO N-64-20, any voter desiring to vote by mail for any reason, including out of concern about the COVID-19 pandemic, can request a mail-in ballot. CAL. ELEC. CODE § 3003. These

---

[3]   *See generally Table 1: States With No-Excuse Absentee Voting*, NATIONAL CONF. OF STATE LEGIS., May 1, 2020, available at https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx (last visited June 11, 2020).

Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction

procedures still apply to *all* California voters, including the 43 counties that did not adopt the VCA for 2020.  In addition to other protections, this procedure has the added election integrity protection of requiring voters to request an absentee ballot rather than counties automatically mailing ballots based on California's voter registration lists.

In 2016, the California State Legislature enacted the VCA, creating a new mail-based voting procedure.  CAL. ELEC. CODE § 4005; *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (discussing VCA and California's vote-by-mail procedures).  The VCA established an all-mailed ballot system in which counties could conduct all-mailed elections provided they qualify and opted into the system.  The VCA sets several qualifications that every county must satisfy before being eligible.  CAL. ELEC. CODE § 4005(a)(1)-(10).  County adoption is permissive and the decision to adopt it rests with each county and its election officials.  That is, counties and county election officials are not required to implement the VCA until they, in their sole discretion, initiate the process to qualify and opt in.  *Id.*, § 4005(a)(10)(E-I).  As part of the qualification process, local election officials are required to develop extensive plans regarding the administration of all-mailed balloting under the VCA and a voter education and outreach plan that must be approved by the Secretary of State.  *Id.*  None of this qualification process is required under EO N-64-20.

Only fourteen counties could opt in initially during the 2018 election, which was the first election under the VCA, with remaining counties allowed to opt in beginning January 2020.[4]  CAL. ELEC. CODE § 4005(a).  Only five counties opted in during the 2018 elections.[5]  Ten additional counties opted in for the 2020 elections.[6]  During the March 3, 2020 federal primary, fifteen counties conducted their elections pursuant to the VCA.  The implementation

---

[4]     The fourteen counties initially allowed to opt in were Calaveras, Inyo, Madera, Napa, Nevada, Orange, Sacramento, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sierra, Sutter, and Tuolumne.

[5]     Those counties conducting all-mailed balloting were Madera, Napa, Nevada, Sacramento, and San Mateo.

[6]     The ten new counties opting to conduct their elections by mail are Amador, Butte, Calaveras, El Dorado, Fresno, Los Angeles, Mariposa, Orange, Santa Clara, and Tuolumne.

Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction

of the VCA has not been without controversy, especially in Los Angeles County, which was panned by the local media as demonstrating "legitimate incompetence,"[7] while the national media referred to it as a "voting fiasco."[8]

### B. Executive Order N-64-20 and Governor Newsom's Unilateral Decision to Impose a New All-Mail Ballot Procedure.

On March 4, 2020, Governor Newsom proclaimed a state of emergency in response to the COVID-19 epidemic and began issuing a series of executive orders.  (*Exhibit 5, Proclamation of a State of Emergency*, March. 4, 2020.)  On May 8, 2020, he issued EO N-64-20, which changed the time, place, and manner for voting during the November 3, 2020 federal election.[9]  (*Exhibit 2*.)  In that order the Governor announced a number of findings, including that "all Californians must be empowered to vote by mail."  (*Id*. at 1.)  The order mandated that "[a]ll voters who are […] registered to vote" in the November 2020 election must be sent all-mailed ballots, regardless of whether requested by the voter.  (*Id*. at 2.) The Order includes several assertions regarding the Governor's authority, including that CAL. GOV'T CODE §§ 8567, 8571, and 8627 provided him authority to impose an entirely new all-mailed ballot procedure.  (*Exhibit 2* at 2.)

In effect, the Order abrogated the permissive aspects of the VCA, imposing a mandatory new regime that contravenes the decisions of the California legislature and the 43 California counties not to "opt in."  It is important to recognize, however, that Governor Newsom did not merely compel these 43 counties to comply with the VCA.  To the contrary, his order set aside mandatory conditions that counties previously had to meet to even qualify to

---

[7]    *See Exhibit 3*, attached, John Myers, et al., *California Officials Demand Changes to L.A. Voting After Election Day Chaos*, L.A. TIMES, Mar. 4, 2020, available at https://rb.gy/5hpx42 (last visited June 11, 2020).

[8]    *See Exhibit 4*, attached, Wall. St. J. Editorial, "*California Steals Its Own Election*," WALL ST. J., Mar. 6, 2020 https://rb.gy/dimkie (last visited June 11, 2020).

[9]    In addition to any state or local races, Californians will elect a new delegation to the U.S. House of Representatives and select which slate of presidential electors to appoint.  Though the names of presidential and vice-presidential candidates appear on the ballot, voters are actually casting a vote in favor of the appointment of a group of electors that have pledged to support those candidates.  *See* CAL. ELEC. CODE §§ 6902 and 8304.

"opt in" to all-mail elections under the VCA.  *See* CAL. ELEC. CODE § 4005(a)(1)-(10) ("any county may conduct any election as an all-mailed ballot election if *all of the following apply*") (emphasis added); *Exhibit 1*, ¶ 1 ("Notwithstanding any limitation on the distribution of vote-by-mail ballots in Elections Code sections […] 4000-4007 . . .").  On June 3, 2020, the Governor issued Executive Order N-67-20 ("EO N-67-20) in which he again claimed authority to change the time, place, and manner of holding the November 2020 election.  (*Exhibit 6*, Executive Order N-67-20, June 3, 2020.)  Among other things, EO N-67-20 clarified which of the qualifications contained in the VCA were "conditionally suspended" for the November 2020 elections.  (*Id.*, ¶¶ 4, 5, 6.)  The Order seeks to supersede and replace the VCA with a system of rules and procedures of the Governor's own devising, which conflict with laws enacted by the California Legislature.

Following the commencement of this suit, and the related suit by the Republican National Committee, California's general assembly has been considering legislation in response to Governor Newsom's order, including Assembly Bill 860.[10]

## C. California's Voter Registration Lists Are Not Ready for All-Mailed Voting.

Judicial Watch has long been investigating violations of federal voting law committed by California, including violations of the NVRA, 52 U.S.C. § 20501, *et seq*.  Congress enacted the NVRA with two stated purposes: first, to "increase the number of eligible citizens who register to vote" and "enhance[]" their "participation . . . as voters in elections for Federal office"; and second, "to protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained."  *Id.*, § 20501(b).  The second goal was embodied in Section 8, which requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of

---

[10]   *See Exhibit 7*, John Wildermuth, "*California Lawmaker Scrambles to Fix Bill to Make it Clear Ballots Won't Go to Phantom Voters,*" S.F. CHRONICLE, June 4, 2020 available at   https://www.sfchronicle.com/politics/article/California-lawmaker-scrambles-to-fix-bill-to-15317858.php (last visited June 11, 2020).

eligible voters by reason of" death or a change in the residence of the registrant.  52 U.S.C. § 20507(a)(4).

The NVRA specifies a particular procedure for confirming the addresses of those who may have changed residence without informing the State.  If a forwardable notice requesting address confirmation is mailed to a voter's last known residence, and if the voter fails to respond to it and then does not "vote[] or appear[] to vote" for two general federal elections— basically, a period of from two to four years—that voter's name is removed from the rolls. *Id.*, § 20507(d)(1)(B).  Until the statutory period has run, voters who have not responded to address confirmation notices are said to be "inactive."  *e.g.*, 11 C.F.R. § 9428.7 and Cal. Code Regs. tit. 2, § 20108.1.  Such voters are registered voters who may vote at any time during that period, at which point they are considered "active" again, and the removal process stops.  52 U.S.C. § 20507(e).  But if a notice is sent and not responded to and the statutory period runs, these registrations must be removed.  *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1841-42 (2018) ("Not only are States allowed to remove registrants who satisfy these requirements, but federal law makes this removal mandatory.").

Relying on data concerning California contained in a report from the Election Assistance Commission ("EAC") and other information, Judicial Watch sued California and Los Angeles County in December 2017 for violating the NVRA by failing to remove the registrations of voters who had moved elsewhere. [11]  The case was settled in January 2019. (*Exhibit 8*, Settlement Agreement, *Judicial Watch v. Logan*, 2:17-cv-8948 (C.D. Cal. Jan. 3, 2019) (ECF No. 96-1).)  The agreement was noteworthy for a number of reasons, not the least of which was that the defendants admitted one of the most startling allegations in the complaint: "Defendants represent that, as of April 27, 2018, there were approximately 1,565,000

---

[11]    In June of each odd-numbered year, the federal EAC is required to report to Congress its findings relating to state voter registration practices.  52 U.S.C. § 20508(a)(3). Federal regulations require states to provide registration statistics directly to the EAC for use in this biennial report, including recent numbers of active and inactive registered voters and of registrations removed from the rolls for any reason.  11 C.F.R. § 9428.7(b)(1), (2), (5).

registrations on Los Angeles County's inactive file of registered voters." (*Id.* at 6.)  This staggering number amounts to nearly a quarter of the county's voter registration list.  It also exceeds the *total* populations of twelve individual states.[12]  The defendants accounted for this high number on the ground that they had believed, and "maintained in this litigation, that the removal from the rolls of a registrant who meets the conditions specified in Section 8(d)(1) of the NVRA is permissive, not mandatory." (*Id.* at 5.)  They basically conceded, however, that this position had become untenable after the Supreme Court's *Husted* decision in June 11, 2018.  (*Id.*)

In the course of litigating that case, Judicial Watch learned that the source of the defendants' mistaken interpretation of the NVRA, pursuant to which inactive registrants need *never* be removed, was a decades-old consent judgment with the U.S. Department of Justice.  In 1998, the Justice Department and the State of California entered into a consent order wherein California agreed to stop enforcing state law regarding the removal of inactive registrants.  (*Exhibit 9*, Stipulated Order in *Wilson v. United States*, Civ. No. C-95-20042-JW and C-94-20860-JW (February 2, 1998).)  This basically ended the State's efforts to comply with one of the NVRA's core election integrity requirements—to remove ineligible voters who have changed residence.  Whatever the misguided reasoning behind the Justice Department's decision to relieve California of its obligations under federal law, the basis for it was squarely rejected by the Supreme Court in *Husted*.

In the intervening 20 years since that consent judgment, however, California has largely failed to remove the registrations of voters who have changed residence.  (Popper Decl., ¶ 3.)  In the EAC report issued in 2017, some of the largest counties in California, including Orange County, Riverside County, Alameda County, Contra Costa County, San Mateo County, Ventura County, San Joaquin County, Sonoma County, and Santa Cruz County, responded "Not applicable" when asked how many address confirmation notices

---

[12]    Wyoming, Vermont, North Dakota, Alaska, South Dakota, Delaware, Montana, Rhode Island, New Hampshire, Maine, Hawaii, and Idaho.

Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction

they had sent. (*Id.*, ¶ 6.)  The damage done to the integrity of California's voter rolls has been incalculable.  Because mailing address confirmation notices has for years had few real consequences in California, such mailings have not been systematic and have been poorly tracked. (*Id.*, ¶ 6.)  For example, almost all of those on Los Angeles County's inactive list had to receive *another* address confirmation notice.  Given that there is no way to speed up the NVRA's statutory waiting period, its voter rolls will not be corrected for years. (*Id.*, ¶ 7.)

When there is no real incentive to send confirmation notices to those who are believed to have moved, the accuracy of the *active* list becomes impaired as well.  Ever greater numbers of registrants who have moved are *not* sent address confirmation notices, and so remain listed as active voters. (*Id.*, ¶ 8.)  The parlous condition of California's voter rolls ensures that mailing ballots to the addresses of every active voter in the 43 non-VCA counties will mean that such ballots will be sent to the addresses of many voters who have moved.[13] These unmonitored, live ballots present substantial risks of abuse and, more importantly, show that California is not ready for all-mailed ballots statewide.

The particular risks associated with mailed ballots were acknowledged 15 years ago by the bi-partisan Carter-Baker Commission.  It observed that "[a]bsentee ballots remain the largest source of potential voter fraud."  Rept. Of Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections at 46 (2005) available at https://rb.gy/y6dtx8 (last visited June 11, 2020).

> Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted. Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation.  Vote buying schemes are far more difficult to detect when citizens vote by mail.

---

[13]   Whether ballots ultimately will be mailed to inactive registrants under EO N-64-20 remains unclear.  While the original executive order called for the mailing of ballots to all voters "registered to vote," which would include inactive registrants by definition, his subsequent order stated that "this provision is not intended, and shall not be construed, to mean that voters in an inactive voter registration status shall receive vote-by-mail ballots." (*Exhibit 2*, ¶ 1; and *Exhibit 6*, ¶ 1.)  The California legislature, however, may not agree to this restriction. (*Exhibit 7*.)

8

*Id*.  Only last month, similar concerns were expressed by a Stanford University study, which was commenced prior to the onset of the COVID-19 pandemic.  (*Exhibit 10*, *Signature Verification and Mail Ballots: Guaranteeing Access While Preserving Integrity*, STANFORD LAW SCHOOL, Law and Policy Lab, May 15, 2020.)  The study noted that there are "concerns around vote-by-mail relat[ing] to preserving election integrity and voter confidence in the process." (*Id*. at 13.)  "When a voter votes from home, they are doing so outside the supervision of election officials." (*Id*.)  Opportunities for "foul play" occur "throughout the chain of custody of the ballot, beginning with how a voter requests a ballot and then receives, completes, and returns it." (*Id*.)  The study noted a number of related risks inherent in voting by mail:

> At-home voters could be more susceptible to pressure from family members. And there are a significant number of votes lost in the vote-by-mail process that might not be lost at traditional polling places.  For example, not all requested vote-by-mail ballots actually make it to the voter.  A significant number of vote-by-mail votes are rejected for errors such as over-voting or incorrect completion that might have been detected and fixed in person.  Lastly, many vote-by-mail ballots are rejected for missing or mismatched signatures.  In the 2012 general election, 23% of uncounted vote-by-mail ballots in California were rejected due to mismatched signatures.

(*Id.*)  Indeed, the primary safeguard against voter fraud is signature verification, which the study characterizes as prone to error and uncertainty.  "There are limited statewide uniform criteria or standards for signature verification, and what 'counts' as a matching signature varies enormously from county to county." (*Id.* at 2.)

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).  In evaluating these criteria, the Ninth Circuit employs a "sliding scale," under which a "preliminary injunction is appropriate" if a plaintiff shows that there are "serious questions going to the merits" and that "the balance of hardships tips sharply in the plaintiff's favor." *Alliance For The Wild Rockies v.*

9

*Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotations and citation omitted).

## ARGUMENT

**II.  Plaintiffs Are Likely to Succeed on the Merits Because EO N-64-20 Violates the Elections Clause and the Electors Clause.**

### A. Governor Newsom Has No Power to Regulate Federal Elections Under the Elections Clause and the Electors Clause.

EO N-64-20 violates the Elections Clause and the Electors Clause because it was not enacted pursuant to California's lawmaking power or some unique lawmaking function that is prescribed under the California constitution.  *Smiley v. Holm*, 285 U.S. 355, 368 (1932) (striking down an effort by Minnesota's Legislature to implement a vetoed redistricting plan because it was not enacted according to the state's prescribed method for legislative enactments); s*ee also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2659 (2015).  "Legislature" has never been extended to include executive orders, emergency or otherwise.  Neither Congress nor the California Legislature ever delegated such powers to the executive branch.

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations[.]"  U.S. CONST. art. I, § 4 (emphasis added).  "In practice, the [Elections] Clause functions as a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices."  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation and internal quotation omitted).  Similarly, the Electors Clause reserves for state legislatures the power to regulate the appointment of electors, providing that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct[.]"  U.S. CONST. art. II, § 1, cl. 2.  Governor Newsom has no legislative power, and EO-N-64-20 did not arise out of any legislative lawmaking function.

The California Constitution makes clear that its legislative power "is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to

themselves the powers of initiative and referendum." CAL CONST., art. IV, § 1. "The powers

of state government are legislative, executive, and judicial.  Persons charged with the exer-

cise of one power may not exercise either of the others except as permitted by this Consti-

tution." CAL CONST., art. III, § 3.  "[U]nlike the United States Congress, which possesses

only those specific powers delegated to it by the federal Constitution, it is well established

that the California Legislature possesses *plenary* legislative authority except as specifically

limited by the California Constitution." *Howard Jarvis Taxpayers Ass'n v. Padilla*, 62 Cal.

4th 486, 498 (2016) (citation omitted).  "Lying at the core of that plenary authority is the

power to enact laws." *Id.* (citation omitted).  The California Governor, in fact, is forbidden to

have such power, except as expressly provided under the state constitution.**14**  *Lukens v.*

*Nye*, 156 Cal. 498, 501 (1909).

In evaluating whether a state action emanates from the "Legislature," the Supreme

Court takes a contextual and functional approach.  *Ariz. State Legis.*, 135 S. Ct. at 2666-68

(2015).  The Court noted that "the meaning of the word 'legislature,' used several times in

the Federal Constitution, differs according to the connection in which it is employed, depend-

ing upon the character of the function which that body in each instance is called upon to

exercise." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932) (citations

omitted).  For example, in the context of ratifying constitutional amendments under Art. V,

"Legislature" is narrowly interpreted because "[r]atification … 'has its source in the Federal

Constitution' and is not an 'act of legislation in the proper sense of the word.'" *Ariz. State*

*Legis.*, 135 S. Ct. at 2668 (quoting *Hawke v. Smith*, 253 U.S. 221, 40 (1920)); *see also U.S.*

*Term Limits, Inc. v. Thornton*, 514 U.S. 779, 800-801 (1995) (explaining the distinction be-

tween powers of the newly created Federal Government and those retained by the pre-

existing sovereign states).

In *Ariz. State Legis.*, the Court determined that "Legislature" in the Elections Clause

---

**14**    The Governor's principal legislative function under the state's constitution is
his veto power, which is not at issue here.  *See* CAL CONST., art. III, § 10.

Plaintiffs' Memorandum in Support
of Motion for Preliminary Injunction

context means certain legislative functions or lawmaking power that are performed accord-

ing to state-specific lawmaking prescriptions, such as gubernatorial vetoes and citizen initi-

atives related to redistricting.[15] *Ariz. State Legis.*, 135 S. Ct. at 2668 (citations omitted).  EO

N-64-20 does not fit any of the lawmaking prescriptions that have been recognized by the

Court, such as the California's Legislature's lawmaking process or part of a citizen initiative.

"The general principle is unquestionably true, that our system is not a pure democ-

racy, but a representative republican government; one of whose departments, the Legisla-

ture, has the exclusive faculty of enacting laws." *Hobart v. Supervisors of Butte Cty.*, 17 Cal.

23, 30 (1860).  To hold that executive orders are part of the state lawmaking power risks

introducing "a virus which destroys that power, which in effect annihilates representative

government and causes a State where such condition exists to be not republican in form in

violation of the guarantee of the Constitution." *Ohio ex rel. Davis v. Hildebrant*, 241 U.S.

565, 569 (1916) (citation omitted).

**B.  The Governor Lacks the Authority He Assumes Under State Law.**

EO N-64-20 identified three provisions from the California Emergency Services Act,

CAL. GOV'T CODE § 8550, *et seq.*, which Governor Newsom claimed granted him authority

to regulate federal elections.  (*Exhibit 2.*)  CAL. GOV'T CODE §§ 8567, 8571, and 8627.  How-

ever, these provisions do not grant him lawmaking power of the type "prescribed for legisla-

tive enactments." *See Smiley*, 285 U.S. at 367. Even if the California Legislature could grant

Governor Newsom authority to prescribe legislative enactments, EO N-64-20 is *ultra vires*

under state law.

**1.  CAL. GOV'T CODE §§ 8567 and 8627.**

Section 8567 grants the Governor authority to "make, amend, and rescind orders and

---

[15]    Alternatively, Plaintiffs submit that "Legislature" may be more strictly construed under the Electors Clause since the power to appoint electors is sourced from the Federal Constitution and is not one of the original powers retained by the pre-existing sovereign States.  *See Ariz. State Legis.*, 135 S. Ct. at 2668.  However, because EO N-64-20 fails under the Elections Clause analysis from *Ariz. State Legis.*, this Court need not resolve that question here.  *Id.*

regulations necessary to carry out the provisions of [the California Emergency Services Act]" which "shall have the force and effect of law."  Section 8627 grants the Governor authority to commandeer state agencies and exercise "all designated police powers" as well as issue "orders and regulations" he deems necessary under § 8567.  Neither § 8567 nor § 8627 give the Governor the authority to unilaterally change state election laws and do not apply here.

The power to make, amend, or rescind orders and regulations is not the power to legislate or make "legislative enactments."  *Smiley*, 285 U.S. at 367.  Moreover, the Governor is not amending or rescinding any orders or regulations.  He is attempting to enact new law that conflicts with existing law enacted by the California Legislature.  Section 8627 further fails to provide him authority because "the regulation of congressional elections is not a subject of state police power[.]"  *Fish v. Kobach*, 840 F.3d 710, 727 (10th Cir. 2016).

### 2.   CAL. GOV'T CODE § 8571.

Section 8571 provides that during a state of emergency Governor Newsom "may suspend any regulatory statute, or statute prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any state agency" provided he "determines and declares that strict compliance … would in any way prevent, hinder, or delay the mitigation of the effects of the emergency."  But the Governor is not seeking to suspend anything in his Order.  Instead, he is attempting to impose an entirely new election system on the State and transform permissive provisions under California law into mandatory provisions.  Such transformation is not "suspending" even under the most deferential interpretation of his emergency authority.  Whatever "suspend" means in § 8571, it is not the power to enact legislation as required under *Smiley*.

Section 8571 limits the Governor's power to suspend only "regulatory statutes," statutes that "proscrib[e] the *procedure* for conduct of state business," and "orders, rules, and regulations of any state agency."  CAL. GOV'T CODE § 8571 (emphasis added).  Neither the California Code nor state authority define "regulatory statutes."  Section 8571 has never been extended by state courts to include election laws.  All the regulatory statutes that have

13

1  come before California courts involve, as one would expect, licensing, business regulation,

2  and public welfare.[16]  Similarly the "procedure for conducting state business" is not defined

3  under state law.  It would be beyond peculiar for the State to claim that election laws are

4  regulations prescribing the "procedures for conduct of state business."   Likewise, enacted

5  election laws are not covered by "orders, rules, and regulations of any state agency."  More

6  than likely § 8571 means the Governor is authorized to cut red tape and eliminate roadblocks

7  that can slow the government's responsiveness to a crisis, as Plaintiffs in the related case

8  explain.  *See* ECF No. 24-1 at 20-23, *Memorandum in Support of Preliminary Injunction,*

9  *Rep. Nat. Comm. et al., v. Newsom*, et al., 2:20-cv-01055 (E.D. Cal. June 6, 2020).

10  **III.  The Remaining *Winter* Factors Weigh Heavily in Favor of Preliminary Relief.**

11        EO N-64-20 will cause irreparable harm because it violates the constitution and will

12  confuse and disenfranchise voters unless enjoined.  The Ninth Circuit has long recognized

13  that constitutional violations in general constitute irreparable harm.  *Rodriguez v. Robbins*,

14  715 F.3d 1127, 1144 (9th Cir. 2013); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th

15  Cir. 2009); and *Griffin v. Padilla*, 417 F. Supp. 3d 1291, 1307 (E.D. Cal. 2019), vacated on

16  other grounds, 2019 U.S. App. LEXIS 38890 (9th Cir. Dec. 16, 2019).  The loss of constitu-

17  tional rights "for even minimal periods of time, unquestionably constitutes irreparable injury."

18  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citation omitted).  Two years ago, California

19  argued to the Ninth Circuit that "changing voting systems between the primary and general

20  elections would result in voter confusion and disenfranchisement."  *Short*, 893 F.3d at 680.

21

22        **16**      *See generally, e.g.*,  *Alvarado v. Selma Convalescent Hosp.*, 153 Cal. App.

23  4th 1292, 1304 (2007) (noting that a statute limiting nursing hours is a "regulatory statute");
   *Bronco Wine Co. v. Jolly*, 129 Cal. App. 4th 988 (2005) (upholding regulatory statute con-

24  cerning wine labeling); *Horeczko v. State Bd. of Registration*, 232 Cal. App. 3d 1352, 1358
   (1991) (upholding "regulatory statute" requiring license and restricting use of "engineer");

25  *Carleton v. Tortosa* 14 Cal. App. 4th 745, 755 (1993) (noting that real estate agents are
   subject to certain "regulatory statutes"); and *In re Jennings*, 106 Cal. App. 4th 869, 891

26  (2003) (noting that restrictions on the sale of alcohol is a "regulatory statute enacted for the
   protection of public morals and public health"), rev'd on other grounds, 34 Cal. 4th 254

27  (2004); *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) (upholding California "reg-
   ulatory statute" restricting crab fishing).

28

Yet, that is exactly what the Governor is doing now, ignoring the irreparable harm the State previously recognized.

Moreover, given that California failed to comply with the NVRA's list maintenance provisions for twenty years, this harm will be significant because the State's voter registration lists are not ready for a broad-based, all-mailed ballot election and will not be ready by November 3, 2020.   California will flood the state with ballots mailed to countless voters at locations they no longer reside, including some that moved almost twenty years ago.   Because of its longstanding list maintenance failures there is reason to believe these problems apply to both active and inactive registered voters.   Further, since it takes at least two federal election cycles before most voters can be removed under the National Voter Registration Act, 52 U.S.C. § 20507, there is no quick fix to the problems identified with California's voter registration lists. Just the damage this will do to the confidence in California's elections is significant and irreparable.   *Cf. Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (finding that confidence in electoral integrity "encourages citizen participation in the electoral process.").   Without preliminary relief, it will be impossible to reverse or enjoin EO N-64-20 once ballots are mailed out.

The public interest and the balance of the equities weigh heavily in favor of granting the preliminary relief requested.   On one hand, the State "can derive no legally cognizable benefit from being permitted to further enforce" a constitutional violation.   *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012) (citation omitted). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (citation and quotation marks omitted).

On the other, it is in the public's interest to grant preliminary relief and resolve these legal questions now.   Without preliminary relief, there is a high likelihood that federal courts will be called upon to evaluate the legality of EO N-64-20 post-election.   Given the nature of federal offices, it will be virtually impossible for a court to provide aggrieved persons post-

15

1  election relief.   "[I]t is 'clear that it would not be equitable or in the public's interest to allow

2  the state . . . to violate the requirements of federal law, especially when there are no ade-

3  quate remedies available.'"  *Griffin*, 417 F. Supp. 3d at 1308 (quoting *Valle del Sol, Inc. v.*

4  *Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

5        Further, unresolved questions about the legality of EO N-64-20 may lead to more

6  serious disputes later, possibly having a nationwide impact.  The 117th Congress will meet

7  on January 6, 2021 to certify each state's electoral votes.  *See* U.S. CONST. AMEND. XII; and

8  3 U.S.C. § 15.  During that process, Congress will have the right to voice its objection to the

9  counting of any state's electoral votes.  *See Bush v. Gore*, 531 U.S. 98, 130 (2000) ("[3

10  U.S.C. § 5] sets certain conditions for treating a State's certification of Presidential electors

11  as conclusive in the event that a dispute over recognizing those electors must be resolved

12  in the Congress under 3 U.S.C. § 15.").  If on that date the electoral margin between the

13  President Trump and Vice-President Biden is less than 55 electoral votes, the dispute over

14  the legality of EO N-64-20 may take on even greater significance.  Granting preliminary relief

15  now resolves the legal question before it deteriorates into an intractable political question

16  later.[17]  It is in the public interest to have the courts resolve this legal question to ensure that

17  California's electors are counted.

18                                      **CONCLUSION**

19        For all the above reasons, the Court should grant Plaintiffs' motion for preliminary

20  injunction.

21

22

23

24

25

─────────────────────

26        [17]    That is not to say that this litigation is a political dispute, or the resolution will
    eliminate post-election political disputes.  However, it is in the public's interest to have the
27  legal question about whether EO N-64-20 violates the Elections or Electors Clauses re-
    solved by the courts now.

28                                          16

                                            Plaintiffs' Memorandum in Support
                                            of Motion for Preliminary Injunction

June 11, 2020

Respectfully submitted,

JUDICIAL WATCH, INC.

By:     s/ Russell Nobile
        Robert Patrick Sticht (SBN 138586)
        T. Russell Nobile*
        Robert Popper*
        Eric Lee (SBN 327002)
        JUDICIAL WATCH, INC.
        425 Third Street SW, Suite 800
        Washington, D.C. 20024
        (202) 646-5172
        (202) 646-5199 (fax)
        Rsticht@judicialwatch.org
        Rnobile@judicialwatch.org
        Rpopper@judicialwatch.org
        Elee@judicialwatch.org

        *Admitted Pro Hac Vice

        Attorneys for Plaintiffs

17