1 | MARK D. ROSENBAUM (CA Bar No. 59940)
mrosenbaum@publiccounsel.org
2 | KATHRYN EIDMANN (CA Bar No. 268053)
keidmann@publiccounsel.org
3 | JESSELYN FRILEY (CA Bar No. 319198)
jfriley@publiccounsel.org
4 | PUBLIC COUNSEL
610 S. Ardmore Avenue
5 | Los Angeles, California 90005
Telephone:   (213) 385-2977
6 | Facsimile:     (213) 385-9089

7 | JOHN LIBBY (CA BAR NO. 128207)
jlibby@manatt.com
8 | MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
9 | Los Angeles, California 90067
Telephone:  (310) 312-4000
10 | Facsimile:   (310) 312-4224

JON GREENBAUM (CA Bar No. 166733)
jgreenbaum@lawyerscommittee.org
EZRA ROSENBERG (D.C. Bar No. 360927)
*Pro Hac Vice* Application Pending
erosenberg@lawyerscommittee.org
POOJA CHAUDHURI (CA Bar No. 314847)
pchaudhuri@lawyerscommittee.org
BRADLEY S. PHILLIPS (CA Bar No. 85263)
bphillips@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS
1500 K Street NW
Washington, DC 20005
Telephone:   (202) 662-8600
Facsimile:     (202) 783-0857

CHRISTOPHER L. WANGER (CA Bar No. 164751)
cwanger@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, California  94111
Telephone:  (415) 291-7400
Facsimile:   (415) 291-7474

13 | Attorneys for Intervenor-Defendants,
CALIFORNIA COMMON CAUSE, LEAGUE
14 | OF WOMEN VOTERS OF CALIFORNIA, and
COMMUNITY COALITION

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL ISSA, JAMES B. OERDING, JERRY GRIFFIN, MICHELLE BOLOTIN, and MICHAEL SIENKIEWICZ<br><br>Plaintiffs,<br><br>vs.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; and ALEX PADILLA, in his official capacity as Secretary of State of California,<br><br>Defendants. | Case No. 2:20-cv-01044-MCE-CKD<br><br>**AMICUS BRIEF IN SUPPORT OF DEFENDANTS' AND INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Date: July 16, 2020**<br>**Time: 2:00 pm**<br>**Courtroom: 7, 14th Floor**<br>**Judge: Hon. Morrison C. England, Jr.** |

## I. INTRODUCTION

Pursuant to the Court's Order of June 22, 2020 (Dkt. 56), Amici California Common Cause, the League of Women Voters of California, and Community Coalition (collectively, "Amici") submit the following amicus brief in support of Defendants' and Intervenor-Defendants' opposition to the Motion of Plaintiffs Darrell Issa, James B. Oerding, Jerry Griffin, Michelle Bolotin, and Michael Sienkiewicz ("Plaintiffs") for a preliminary injunction. As a preliminary matter, Amici submit that, as Defendants and Intervenor-Defendants have shown in their opposition brief, the preliminary injunction motion and the entire action have been mooted by the enactment of superseding legislation. The motion should be denied on that basis alone.

## II. ARGUMENT

### A. Plaintiffs Lack Standing to Pursue Their Claims

The Supreme Court's decision in *Lance v. Coffman*, 549 U.S. 437 (2007), forecloses plaintiffs' standing here to bring claims under the Elections Clause and the Electors Clause because their alleged injury is, at most, the kind of generalized grievance about the conduct of government that the Supreme Court has held is insufficient to confer standing under either of those clauses.

Plaintiffs in this case and its related case are components of a political party, a single congressional candidate, and four voters, and none of them comes close to establishing the required level of injury necessary to proceed with their Elections Clause and Electors Clause claims. Their motions for preliminary injunction allege only generalized harm to voters or that harm will result from Governor Newsom's alleged violation of law. (Case 2:20-cv-01055, Dkt. 24-1 at 15:20-21 and 16:1-2; Case 2:20-cv-01044, Dkt. 38-1 at 14:11-13.) The Supreme Court rejected exactly this position in a *per curiam* opinion focusing solely on standing to bring an Elections Clause claim in *Lance*, 549 U.S. at 442 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.").

The only cases in which the Supreme Court has found standing to bring Elections Clause and Electors Clause claims are those brought by or on behalf of a state, a state legislature or a working majority of a state legislature. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663-65 (2015) (Plaintiff Arizona Legislature had standing because a voter initiative to establish an independent redistricting commission eliminated its ability to implement a redistricting plan, thus causing a "concrete and particularized" institutional injury). In *Ariz. State Legislature*, the Court distinguished *Rainey v. Byrd*, 521 U.S. 811 (1997) (six individual members of Congress lacked standing to challenge the line-item veto), from *Coleman v. Miller*, 307 U.S. 433 (1939) (working majority of Kansas State Legislature had standing to challenge lieutenant-governor's tie-breaking vote in favor of a federal constitutional amendment).

**B. California's Legislature May, Consistent With the Elections Clause and Electors Clause, Delegate Lawmaking Authority to the Governor**

Relying on an unsupportable construction of the Elections Clause and Electors Clause, the RNC Plaintiffs[1] assert that "the Legislature cannot delegate to the Governor the power to amend, repeal, or suspend validly enacted election-integrity laws." (RNC Memo at 11.) The Plaintiffs in this action, while never asserting directly that the legislature may not delegate lawmaking authority, imply as much, stating that "[e]ven if the California Legislature could grant Governor Newsom authority to prescribe legislative enactments, EO N-64-20 is ultra vires under state law." (Issa Memo at 12.) Both sets of plaintiffs are wrong. Indeed, acceptance of these plaintiffs' position would subject virtually every state's election processes to attack as unconstitutional, a result never intended by the Elections Clause and Electors Clause.

Plaintiffs' position is squarely foreclosed by the Supreme Court's decision in *Ariz. State Legislature, supra,* 135 S. Ct. 2652. There, the Court held that "legislature" as used in the Elections Clause means the "power that makes laws" consistent with a state's constitution and encompasses the people of Arizona's exercise of the initiative process authorized by the Arizona Constitution. *Id*. at 2671; *see also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018)

---

[1] The "RNC Plaintiffs" are Republican National Committee, National Republican Congressional Committee and California Republican Party - the plaintiffs in related case No. 2:20-CV-01055-MCE-CKD.

("The Supreme Court interprets the words 'the Legislature thereof' as used in [the Elections Clause], to mean the lawmaking processes of a State."). Having equated the people's lawmaking through initiative with the exercise of legislative authority, the Court held that "the people may delegate their legislative authority over redistricting to an independent commission just as the representative body may do." *Id.* Thus, any argument that the California Legislature may not delegate its lawmaking function with respect to federal elections fails under controlling Supreme Court authority. *See Corman*, 287 F. Supp. 3d at 573 ("The Elections Clause … affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority.")

Any suggestion that a state's governor, in particular, may not participate in the lawmaking function under the Elections Clause and Electors Clause is similarly meritless. In *Ariz. State Legislature*, the Court reiterated its holding in *Smiley v. Holm*, 285 U.S. 355 (1932), that "the Elections Clause … respect[s] the State's choice to include the Governor in [the lawmaking] process …." 135 S. Ct. at 2667 (*citing Smiley*, 285 U.S. at 368); *see also Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC (D. Nev. Apr. 30, 2020), 2020 WL 2089813, *8 (finding that the Nevada Legislature delegated its authority under the Elections Clause to the secretary of state).

A state's discretion to delegate lawmaking authority to entities and officials other than the "legislature" itself is consistent with "[t]he dominant purpose of the Elections Clause," which is "to empower Congress to override state election rules, not to restrict the way States enact legislation." *Ariz. State Legislature*, 135 S. Ct. at 2672. Respecting the authority of the California Legislature to delegate its lawmaking authority to others, including the governor, is consistent with the Supreme Court's admonition that "it is characteristic of our federal system that States retain autonomy to establish their own governmental processes." *Id*. at 2673; *see also id.* at 2677 ("[T]he Clause surely was not adopted to diminish a State's authority to determine its own lawmaking processes.").

In *Ariz. State Legislature*, the Supreme Court emphasized that the strict, legislature-only interpretation of the Elections Clause advanced by the Arizona Legislature would cast doubt on "a host of regulations governing the 'Times, Places and Manner' of holding federal elections."

*Id*. at 2676.  As that Court has stated, the "manner" of holding elections "encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."  *Cook v. Gralike*, 531 U.S. 510, 523-524 (2001) (quoting *Smiley*, 285 U.S. at 366).  Were state legislatures prohibited by the Elections Clause from delegating their authority to make laws concerning these matters, a host of state regulations governing the "time, place, and manner" of federal elections would be invalidated.  To cite just a few examples, *see, e.g.,* Cal. Gov. Code § 12172.5(d) (Delegating to the Secretary of State authority to  "adopt regulations to assure the uniform application and administration of state election laws"); Ga. Elec. Code §§ 21-2-31 (delegating to State Election Board authority to "promulgate rules and regulations so as to obtain uniformity in the practices and procedures of [election officials]"; to "formulate, adopt, and promulgate rules and regulations … as will be conducive to the fair, legal, and orderly conduct of primaries and elections"; and to "promulgate rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote …."),  21-2-50 (delegating to secretary of state authority to "determine the forms of nomination petitions, ballots, and other [required] forms"), 21-2-50.1 (delegating to governor the authority to "postpone the date of any primary, special primary, election, or special election" during a state of emergency), 21-2-70 (delegating to county superintendents authority to select polling places and to "make and issue such rules, regulations, and instructions … as he or she may deem necessary for the guidance of poll officers, custodians, and electors"); Fla. Stat. §§ 97.012 (delegating to secretary of state authority to "provide uniform standards for the proper and equitable administration of the registration laws"), 101.001 (delegating to county commissioners authority to "alter or create precincts for voting"), 101.015 (delegating to Department of State authority to "adopt rules which establish minimum standards for hardware and software for [voting systems]"); N.Y. Elec. Law §§ 3-102 (delegating to state board of elections authority to "promulgate rules and regulations relating to the administration of the election process"), 4-100 (delegating to board of elections authority to create, consolidate, divide or alter election districts); Ill. Elec. Code § 1A-8 (delegating to state board of elections authority to "prescribe and require

the use of … uniform forms, notices, and other supplies" and to "[a]dopt, amend, or rescind rules and regulations").

In short, Plaintiffs' assertion that the California Legislature is prohibited by the Elections Clause or Electors Clause from delegating to the governor, under state law, lawmaking authority with respect to federal elections is meritless.

### C. The Balance of Harms and the Public Interest Favor Denial of the Motion for a Preliminary Injunction

The balance of harms and the public interest weighs heavily in favor of denial of Plaintiffs' motion for a preliminary injunction. The importance of ensuring that all registered voters have the opportunity to safely vote during the current COVID-19 pandemic, and the need to protect poll workers and voters from undue exposure to the virus and reduce its spread, far outweigh Plaintiffs' speculative, anecdotal, and unproven allegations that general distribution of vote-by-mail ballots will result in widespread voter fraud.

#### 1. The Executive Order Will Enable Voters to Cast Ballots Safely and Prevent Further Spread of COVID-19

The COVID-19 pandemic is an ongoing public health emergency that has hit California especially hard and has caused widespread disruptions in civic life. As of June 29, 2020, there were a total of 222,917 positive cases and 5,980 deaths in California.[2] Elderly people and people of any age who have certain underlying conditions, including high blood pressure, diabetes, chronic lung disease, and severe obesity, are especially likely to have prolonged serious illness or to die from the disease. Declaration of Dr. Ranit Mishori (Dkt. 33-5) ("Mishori Decl.") ¶¶ 10-12. People of color have faced especially high rates of infection, complications, and death resulting from this coronavirus.[3] *Id.* ¶¶ 15-22. Latinos are disproportionately likely to contract the virus—in California, Latinos are 39% of the population but make up 54% of the state's coronavirus

---

[2] *COVID-19 Updates*, CAL. DEP'T PUB. HEALTH (June 29, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

[3] *COVID-19 in Racial and Ethnic Minority Groups*, CTRS. FOR DISEASE CONTROL AND PREVENTION (June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html ("[C]urrent data suggest a disproportionate burden of illness and death among racial and ethnic minority groups.").

cases. *Id.* ¶ 21. Black Americans are similarly affected disproportionately—they represent only 5% of California's population but 10% of the state's COVID-19 deaths. *Id.* Nationwide, black Americans are dying at a rate almost two-and-a-half times higher than the corresponding rate for white Americans.[4] Low-income communities have been especially hard-hit.[5]

Doctors and public-health experts have identified several reasons why this coronavirus has caused such devastation in communities of color and low-income communities. Mishori Decl. ¶ 15. The "social determinants of health" are conditions in a person's life that shape every aspect of their health, including their susceptibility to the severest effects of COVID-19 infection. *Id.* ¶¶ 16-17. In communities of color and low-income communities, the social determinants of health include reduced access to quality health care, higher prevalence of underlying chronic medical conditions, and housing challenges. *Id.* ¶¶ 15-19. Already predisposed to medical conditions and poor health, people of color and low-income people are also more likely to be employed in essential jobs that expose them to COVID-19, and they are less likely to have access to testing for coronavirus infection. *Id.* These factors subject people of color and low-income people to greater exposure to the coronavirus, greater severity of disease, and substandard or inaccessible medical care. This confluence of long-standing disparities and injustice is killing people.

While the world waits for a vaccine that is certainly many months or years away, public health experts and government officials have stressed that physical distancing is necessary to prevent the spread of the virus. Mishori Decl. ¶¶ 9, 14. Just last week, in response to a recent spike in cases throughout the state, Governor Newsom ordered partial re-closures in 19 California counties.[6] To keep voters safe, states run by both Republican and Democratic election officials have expanded vote-by-mail options or have conducted elections entirely by mail. Experts agree

---

[4] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RESEARCH LAB (May 27, 2020), https://www.apmresearchlab.org/covid/deaths-by-race.

[5] *See* Wyatt Koma et al., *Low-Income and Communities of Color at Higher Risk of Serious Illness if Infected with Coronavirus*, KAISER FAMILY FOUND. (May 7, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/low-income-and-communities-of-color-at-higher-risk-of-serious-illness-if-infected-with-coronavirus/.

[6] https://covid19.ca.gov/roadmap-counties/.

that this advance planning is necessary because "we can expect that coronavirus will continue to affect, sicken and kill large numbers of Americans moving forward and into the fall." *Id.* ¶ 32.

Primary elections this year in Florida, Illinois, and Wisconsin have proved that in-person voting causes transmission of COVID-19.[7] The risks of in-person voting are clear to doctors and public health experts. Hundreds of voters can cycle through a polling place on Election Day, exposing poll workers and other voters to their respiratory droplets in confined, poorly ventilated spaces that facilitate transmission. *Id.* ¶¶ 34-39. Poll workers themselves are likely to be older—studies have reported that most are over 60—and therefore more likely to have high-risk conditions. *Id.* ¶ 38. Voting machines and materials exchanged among voters and poll workers are potential sites of surface transmission. *Id.* ¶¶ 40-41. Any precautionary measures, such as disinfection of machines and surfaces between each voter, are likely to slow the voting process, which will subject voters to exposure in long lines. *Id.* ¶¶ 41-44. Even if all voters and poll workers followed best practices, they would still face a risk of exposure. *Id.* ¶ 45. Asymptomatic individuals could spread the disease, and those with mild symptoms could decide to vote despite the risk of transmission. *Id.*

### 2.  The "Harms" Alleged by Plaintiffs Are Speculative, Anecdotal, and Unproven

Plaintiffs' allegations echo long-debunked claims that associate mail-in ballots with voter fraud.[8] Their motions are replete with vivid anecdotal images of hundreds of mail-in ballots

---

[7] Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, NEWS 4 JAX (Mar. 30, 2020), https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-coronavirus/; David Smiley & Bianca Padró Ocasio, *Florida Held Its Primary Despite Coronavirus. Two Broward Poll Workers Tested Positive*, MIAMI HERALD (Mar. 26, 2020), https://www.miamiherald.com/news/politics-government/article241539451.html; Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, 5 CHI. (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/; Chad D. Cotti et al., *The Relationship Between In-Person Voting and COVID-19: Evidence from the Wisconsin Primary* (Nat'l Bureau of Econ. Research, Working Paper No. 27187, 2020), https://www.nber.org/papers/w27187.pdf.

[8] *See, e.g.*, Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CTR. FOR JUSTICE (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud; Matt Barretto et al., *Debunking the Myth of Voter Fraud in Mail Ballots*, UCLA LPPI VOTING RIGHTS PROJECT, UNIV. N. M. CTR. FOR SOC. POLICY, UNION OF CONCERNED SCIENTISTS (Apr. 14, 2020), https://latino.ucla.edu/wp-content/uploads/2020/04/LPPI-VRP-Voter-Fraud-res.pdf.

overflowing in apartment building hallways and of voters being unduly influenced by others while voting away from polling places.  (Case 2:20-cv-01055-MCE-CKD, Dkt. 24-1 at 6:9-7:3; Case 2:20-cv-01044-MCE-CKD, Dkt. 38-1 at 9:6-15).

In reality, vote-by-mail fraud is virtually nonexistent.[9]  Millions of Americans vote by mail—one in four voters did so in the last two federal elections.[10]  Yet an exhaustive investigation found only 491 instances of vote-by-mail fraud committed between 2000 and 2012, a period in which billions of votes were cast.[11]  A database maintained by the Heritage Foundation, a conservative think tank, reflects the incredibly low rate of voter fraud in connection with voting by mail in particular—only 16% of the small number of fraud cases were in connection with voting by mail.[12]  The experience of Oregon—which was the first to move to all vote-by-mail elections, in 1998—is illustrative.  The same Heritage Foundation database reflects only two cases of absentee voter fraud in Oregon.[13]  In addition, during the 2016 presidential election, the Oregon attorney general prosecuted just 10 cases of voter fraud out of over 2 million votes cast.[14]

In addition, universal vote by mail is not—or should not be—a partisan issue.  There is no evidence that the wider availability of vote by mail benefits one party over the other.[15]  This is confirmed by the fact that, despite the deep partisan divide perceived in the country, a recent poll found that nearly three-quarters of Americans, including large majorities of both Democrats and Republicans, want mail-in ballots to be sent to all active registered voters, instead of being available only upon request, for the November election.[16]

---

[9] Weiser & Ekeh, *supra* note 7; Barretto, *supra* note 7.

[10] Weiser & Ekeh, *supra* note 7; *see also EAVS Deep Dive: Early, Absentee and Mail Voting*, U.S. ELECTION ASSISTANCE COMM'N (Oct. 17, 2017), https://www.eac.gov/documents/2017/10/17/eavs-deep-dive-early-absentee-and-mail-voting-data-statutory-overview.

[11] Corbin Carson, *Election Fraud in America*, NEWS21 (Aug. 12, 2012), https://votingrights.news21.com/interactive/election-fraud-database/.

[12] Barretto, *supra* note 7 at 6-7.

[13] Barretto, *supra* note 7 at 9.

[14] Barretto, *supra* note 7 at 9.

[15] Barretto, *supra* note 7 at 7.

[16] Chris Kahn, *Most Americans, Unlike Trump, Want Mail-in Ballots for November if Coronavirus Threatens: Reuters/Ipsos Poll*, REUTERS (Apr. 7, 2020),

Plaintiffs' arguments are especially misguided and dangerous because they are based on a complete misrepresentation of right-to-vote jurisprudence. No court has ever ruled that the expansion of the ability to vote for all voters violates the right to vote of one of these voters based solely on the unsupportable speculation that the expansion of the vote could lead to increased voter fraud, thereby purportedly "diluting" the complaining voter's vote. But that is the whole of Plaintiffs' case. Under Plaintiffs' theory, the laws of 33 states that allow "no excuse" absentee voting would be unconstitutional because they lead to more absentee voting. Indeed, under Plaintiffs' theory, any increased accessibility to voting by mail would be constitutionally suspect. Plaintiffs' claims, if successful, would have the effect of endangering poll workers and voters and disenfranchising California's most vulnerable voters, including black Americans, Latinos, and medically vulnerable individuals. The implications could resonate long after this election if Plaintiffs prevail on their theory that voting by mail is per se unconstitutional. For some of the Plaintiffs, this disenfranchisement may be precisely the point.[17]

### 3. The Public Interest Clearly Favors Denial of the Motion

The public interest in ensuring that all registered voters have the right to exercise their right to vote and in preventing the spread of COVID-19 under the current pandemic conditions is clear, for the same reasons set forth above.

### III. CONCLUSION

Based on the foregoing, the Court should deny the Motion.

---

https://www.reuters.com/article/us-usa-election-poll/most-americans-unlike-trump-want-mail-in-ballots-for-november-if-coronavirus-threatens-reuters-ipsos-poll-idUSKBN21P3G0.

[17] Plaintiff Darrell Issa alleges that he "has already had to reevaluate his electoral strategy in order to campaign in the 50th Congressional District as a result of EO N-64-20." Issa Compl. ¶ 53.

| | | |
|---|---|---|
| 1 | Dated: July 7, 2020 | PUBLIC COUNSEL |
| 2 | | |
| 3 | | By: /s/ Mark D. Rosenbaum (as authorized on  7/7/20) |
| | | Mark D. Rosenbaum |
| 4 | | Kathryn Eidmann |
| | | Jesselyn Friley |
| 5 | | 610 S. Ardmore Avenue |
| | | Los Angeles, California 90005 |
| 6 | | Telephone:   (213) 385-2977 |
| | | Facsimile:    (213) 385-9089 |
| 7 | | Email:          mrosenbaum@publiccounsel.org |
| | | keidmann@publiccounsel.org |
| 8 | | jfriley@publiccounsel.org |
| 9 | | LAWYERS' COMMITTEE FOR CIVIL RIGHTS |
| 10 | | By:/s/ Jon Greenbaum (as authorized on 7/7/20) |
| 11 | | Jon Greenbaum |
| | | Ezra Rosenberg |
| 12 | | Pooja Chaudhuri |
| | | Bradley S. Phillips |
| 13 | | 1500 K Street NW |
| | | Washington, DC 20005 |
| 14 | | Telephone:   (202) 662-8600 |
| | | Facsimile:    (202) 783-0857 |
| 15 | | Email:          jgreenbaum@lawyerscommittee.org |
| | | erosenberg@lawyerscommittee.org |
| 16 | | pchaudhuri@lawyerscommittee.org |
| | | bphillips@lawyerscommittee.org |
| 17 | | MANATT, PHELPS & PHILLIPS, LLP |
| 18 | | By: /s/ John Libby |
| | | John Libby |
| 19 | | 2049 Century Park East |
| | | Suite 1700 |
| 20 | | Los Angeles, California 90067 |
| | | Telephone:   (310) 312-4000 |
| 21 | | Facsimile:    (310) 312-4224 |
| | | Email:          jlibby@manatt.com |
| 22 | | |
| 23 | | MANATT, PHELPS & PHILLIPS, LLP |
| | | Christopher L. Wanger |
| 24 | | One Embarcadero Center, 30th Floor |
| | | San Francisco, California  94111 |
| 25 | | Telephone:   (415) 291-7400 |
| | | Facsimile:    (415) 291-7474 |
| 26 | | Email:          cwanger@manatt.com |
| 27 | | Attorneys for Intervenor-Defendants, CALIFORNIA COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF CALIFORNIA, and COMMUNITY COALITION |
| 28 | | |